IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**ROCHELLE STOCKER,**

Case No. 1:19-cv-00105-CL

Plaintiff,

v.

**OPINION AND ORDER**

**BRENDA BLOOMFIELD, CAROLYN LESLEY,**
**CITY OF MEDFORD, OREGON, and**
**NOEL LESLEY EVENT SERVICES, INC.**

Defendants.

CLARKE, Magistrate Judge.

This case comes before the Court on cross motions for summary judgment and partial

summary judgment. Defendants move for summary judgment on all claims brought against them,

while Plaintiff moves for partial summary judgment on Plaintiff's first claim for relief only. For

the reasons discussed below, Plaintiff's Partial Motion for Summary Judgment (#44) is

DENIED. Defendants Detective Garich and the City of Medfords' Motion for Summary

Judgment (#38) is GRANTED. Defendants Carolyn Lesley and NLES, Inc.s' Motion for

Summary Judgment (#42) is GRANTED.[1] All claims are found in favor of defendants.

## BACKGROUND

Plaintiff brings claims against her former employer, Noel Lesley Event Services, Inc.

("NLES") and Carolyn Lesley ("Lesley"), and against the City of Medford and Medford

Detective Brenda Garich (formerly known as Brenda Bloomfield and hereafter referred to as

"Garich") for violations of her substantive due process rights for failure to disclose exculpatory

or impeachment evidence, invasion of privacy, negligent release of confidential information,

intentional infliction of emotional distress, intentional interference with a business relationship,

abuse of process, malicious prosecution, and fraud. These claims arise from Plaintiff's alleged

theft against her employer, for which Plaintiff was indicted by a grand jury and criminal charges

were brought by the Jackson County District Attorney. The theft charge was later dismissed, and

this lawsuit followed shortly after.

### a. The theft investigation and prosecution

NLES is an event services company that has provided tenting services for the NFL during

annual Super Bowl events. Supp. Rowan Decl., Ex. 2 at 15 (#55-2). Lesley at all material times

was and is the president of NLES. *Id.* at 12. Plaintiff started working for NLES on March 15,

2015, as the company's bookkeeper. Plaintiff was primarily responsible for accounts payable,

accounts receivable, payroll, and some budgeting tasks. Kucera Decl., Ex. 1 at 33 (#43-1). At

some point during Plaintiff's employment with NLES, she informed Lesley that she was

planning to take a leave of absence. At the request of another NLES employee, Lori Cook (also

known as Lori Flatley), Lesley installed an audit software called Keylogger on Plaintiff's work

---

[1] The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

computer. The purpose of the software was to obtain bookkeeping passwords and processes for use while Plaintiff was on leave. Kucera Decl., Ex. 6 at 40-42, 49. Lori Cook began using the Keylogger software to review Plaintiff's computer activity to learn the bookkeeping processes. Ms. Cook soon discovered that Plaintiff was using her work computer for personal tasks such as applying for a new job, online shopping, and managing her personal finances. *Id.* at 46. NLES eventually became aware that Plaintiff had been paying herself for time and reimbursements to which NLES claims she was not entitled.

On January 31, 2017, Lesley contacted Plaintiff about a significant number of mileage reimbursements that Lesley believed Plaintiff was not entitled to. Lesley wrote, "the mail is on the way to work and the bank is on the way home from work. If you are paying yourself, I would expect documentation and my sign off. Please send all back up – but I'm not in agreement." Garich Decl., Ex. 1 at 20-21 (#39). A few minutes later, Plaintiff responded "Should I write a check and reimburse the company for my mileage?" *Id.* at 20. Approximately 20 minutes later, Plaintiff printed 10 pages of mileage reimbursement forms. *Id.* at 22. Plaintiff then used her work computer to look up the address of the Phoenix USPS Office, the mileage from work to the Phoenix USPS Office, and the address of the FedEx office. *Id.* at 23-26. Plaintiff then deleted her internet browser history. *Id.* at 27-28. Plaintiff continued to look up her paycheck detail and vendor payments to herself for each pay period and she printed 15 more mileage reimbursement forms. *Id.* at 29-42. That afternoon, Plaintiff emailed 15 pages of mileage forms to Lesley. *Id.* at 43-44. Plaintiff claimed in her deposition that the mileage forms were recorded day-by-day over the course of multiple years and filed in her desk. Mitton Decl., Ex. 8 at 112-13 (#41-8). Plaintiff admitted in her deposition that she did not give these mileage forms to Ms. Cook or to

Lesley for review or approval prior to adding the amounts to her paycheck and processing payroll. *Id.* at 113-16.

Defendants have provided evidence of these allegedly unauthorized reimbursements, including evidence that Plaintiff claimed mileage on days that she did not work for NLES. *See* Garich Decl., Ex. 1 (#39-1). For example, Plaintiff claimed six miles driven on May 16, 2016, even though she had not worked that day due to illness. *Id.* at 1, 14. Plaintiff claimed 16 miles on January 16, 2017, but again did not work that day due to illness. *Id.* at 2, 3. Plaintiff claimed 16 miles on January 3, 2017, but did not work that day due to heavy snowfall. *Id.* at 3, 18. Additionally, defendants have provided evidence that the distance from the NLES office to the post office is just .9 miles, and a round trip from the NLES office to the post office to the bank and back to NLES is just 2.7 miles. Mitton Decl., Ex. 3 (#41-3). And yet, Plaintiff continuously claimed anywhere from six or sixteen miles for such trips.

The NLES employee handbook states that all mileage reimbursements must be approved in advance:

> Employee travel performed in the course of conducting Company business or training related to the employee's position must be approved in advance. Details must be provided along with authorization and approval from a manager or the President of the Company in order for an employee to be reimbursed for expenses incurred in the use of their personal vehicle.

NLES Employee Handbook (#43-13). Plaintiff was the sole employee responsible for processing payroll at NLES. Kucera Decl., Ex. 1 at 38. Plaintiff would process and complete payroll, and then submit to Lesley the total gross amount for all employees. *Id.* 41. Plaintiff did not provide a breakdown of each employee's paycheck to Lesley. *Id.* Lesley claims that Plaintiff never sought preapproval before charging NLES for daily mileage, and that she was not aware

that Plaintiff was paying herself mileage until January 31, 2017. Mitton Decl., Ex. 10 at 55-56 (#41-10).

On February 1, 2017, Lesley sent a text message to Medford Detective Garich stating that she believed Plaintiff was "adding money to her checks." Rowan Dec., Ex. 2 at 1 (#46-2). Lesley explained, "I confronted her and her stories keep changing but she acknowledged that she has no approval to reimburse herself. She did it this month too [and is] (sic) going back and making stuff up that I can prove is wrong." *Id.* Lesley then asked Detective Garich, "What can I do?" *Id.* Garich responded, "That is called stealing and theft!" *Id.* at 2. Lesley then asked, "What is the process to go after her?" and disclosed that Plaintiff was making $50,000 when she started at NLES and now has $126k in savings, $6k in her checking account and $530k in and (sic) Edward Jones account. She hasn't gotten that from her 'job.'" *Id.* To which Garich responded, "You want money or jail? You have all the evidence, just need to document how she is adding it (screenshots and a copy of the computer will work). Do you think she had all the money in her accounts from you?" *Id.* The conversation continued with Garich explaining that Lesley needed figure out how much money was lost and that she had the option of pursuing criminal charges or a civil compromise. *Id.* at 3. Lesley and Garich agreed that Garich would meet with NLES employee, Ms. Cook, to further investigate and obtain evidence of the alleged theft. *Id.*

Lesley and Detective Garich are friends and Garich had worked on a case previously involving NLES. Supp. Rowan Decl., Ex. 4 at 17 (#55-4). The Medford Police Department has approximately 14 detectives, divided between financial crimes and general/major crimes. Garich Decl. (#39). Garich was assigned to the financial crimes unit. Garich testified that it was not unusual for her to investigate crimes that occurred outside of the City of Medford, including in

the City of Phoenix where NLES is located because Phoenix has no financial crimes detective or detectives of any type. *Id.*

On February 2, 2017, Garich met with NLES employee Lori Cook to initiate the criminal investigation of Plaintiff. Cook provided Garich with evidence of unauthorized phone, mileage, and fuel reimbursements made to Plaintiff. NLES also hired an accountant, John Warekois, to look into NLES's financials and investigate the extent of Plaintiff's alleged misappropriation of funds. On February 3, 2017, Lesley asked Garich, "How will I get my money back??" Rowan Decl., Ex 2 at 4 (#46-2). Garich, knowing that Warekois was also looking at NLES's corporate books, responded, "Once John [Warekois] does his work and we have a final on how much she took we will talk. Looks like for 2015, about $1k, 2016 is $2k and this is not counting bonus. Lori [Cook] wasn't sure if the bonuses listed on her paystubs were correct and said you would have to look at them. This is just totals from fuel/phone 'reimbursements'." *Id.* at 4-5.

NLES collected and turned over to Detective Garich documentation that showed Plaintiff had paid herself $5,850.59 of unauthorized funds while employed by NLES. On February 14, 2017, an official police report was filed with the Medford Police Department and Sergeant Brent Mak officially assigned Detective Garich to the case against Plaintiff.

On February 16, 2017, Garich received an email from accountant John Warekois (hereinafter referred to as the "Warekois email") in which he stated,

> I've review the last two months of Bank Statements which include only a copy of the front of the check. From this perspective nothing seems odd and payee's do not appear changed. Activity appears normal and transactions seem to reconcile with no old or outstanding items noted on reconciliations. Most receipts are ACH to the company, so low risk there of manipulation. There are some smaller deposits which I could review to copy of check received, which shouldn't take a lot of time.
>
> We've reconciled payroll activity on the books to the quarterly reports submitted to the taxing authorities. Potentially there could be fraudulent

employee's on the books as Rochelle was the one that was in charge of new hire paperwork. I've asked Lori to review the employee summary report to try to validate the existence of the employee's paid to the best of her knowledge.
Profitability and Cash seem to line up appropriately.

I'll have Lori gather up some of the Credit Card Statements and review the Activity for unauthorized purchases as this seems to have thus far been her area of opportunity.

Warekois Email (#41-14). This email was never turned over to the Jackson County District Attorney's Office. When asked about this email during deposition, Garich testified to the following,

> MR. ROWAN: You can see where it says nothing's—nothing odd.
> MR. MITTON: And that is pulled very much out of context. He's talking about a specific category. I'm joining in the objection.
> BY MR. ROWAN:
> Q. Okay. In the email it says activity—I'll just read it. "Activity appears normal and transactions seem to reconcile with no old or outstanding items noted in reconciliation." Do you see that?
> A. Uh-huh.
> Q. You don't consider that to be exculpatory evidence in this case?
> A. It means she wasn't stealing money directly out of the bank account.
>
> A. I have no idea what John reviewed. So he may or may not have had knowledge as to how Ms. Stocker was stealing from the company.
> Q. You don't consider this email to clarify to be Brady material that you should have disclosed to the district attorney?
> A. No.

Rowan Decl., Ex. 5 at 49-50 (#46-5).

At some point, Garich submitted her investigation findings to the Jackson County District Attorney's Office. A grand jury investigation was completed, and an indictment was issued on May 31, 2017. As trial grew closer in the criminal case against Plaintiff, Lesley expressed concerns with continued participation in the matter and indicated that she did not want to testify at the trial. Kucera Decl., Ex. 7 at 99-101. The criminal case was later dismissed. *Id.* The lead prosecutor in the case against Plaintiff, Melissa LeRitz, testified in a written deposition that the

case was dismissed due to Lesley no longer wishing to proceed with criminal charges. Mitton Decl., Ex. 6 at 5 (#41-6). LeRitz further testified that she was not aware of the friendship between Garich and Lesley prior to being told about it by Plaintiff's attorney, but that she would not have proceeded differently and there was sufficient evidence to take the case to trial if Lesley had been willing to testify. *Id.* at 6.

The deputy district attorney that presented the criminal case to the grandy jury, Ms. Zori Cook, also submitted a written deposition and admitted that she was not aware of the friendship between Garich and Lesley prior to presenting to the grand jury. Mitton Decl., Ex. 7 at 2 (#41-7). DDA Cook testified, "My job as the Grand Jury Deputy on that day was to present the witnesses, evaluate the evidence as it pertained to the charged crimes, and answer questions from the jurors. Any potential friendship between witnesses was irrelevant to the presentation of facts. . . ." *Id.* at 3. When asked "Would it be part of your normal practice to present evidence of this sort [the relationship between Garich and Lesley and the Warekois Email] to a grand jury?" DDA Cook testified, "No. Witnesses swear an oath to tell the truth . . . [u]nless there was a question of material fact that was impacted by a relationship between witnesses it would not be relevant for Grand Jury." *Id.*

### b. *Plaintiff's subsequent employment*

On approximately December 30, 2016, prior to Lesley confronting Plaintiff about the alleged theft, Plaintiff applied for employment with Kairos. She was offered and accepted the job with Kairos while still employed with NLES. Plaintiff gave a two-week notice to NLES in late January or early February that she would be leaving NLES. However, Plaintiff officially terminated her employment on February 6, 2017, before her notice period had expired. Plaintiff began working at Kairos shortly after leaving NLES.

On May 24, 2017, Garich and another detective went to Kairos while Plaintiff was

working. Rowan Decl., Ex 3 (#46-3). Garich and the other detective first interacted with

Plaintiff's supervisor, Angela Warling, and then spoke with Plaintiff. Supp. Rowan Decl., Ex. 5

at 11-12 (#55-5). According to Ms. Warling, she brought Plaintiff to meet with the detectives in

the "first floor conference room" without other employees present. *Id.* at 12-13. The facts as

alleged by Plaintiff as to what happened that day are disputed by defendants Garich and the City,

but they agree generally that Garich went to Plaintiff's new place of employment and cited her

for theft.

According to Plaintiff, Garich allegedly "slammed" her phone down and "her whole

demeanor was aggressive." Supp. Rowan Decl., Ex. 1 at 152. Garich's behavior left Plaintiff

with the impression that Garich was "trying to run [her] over." *Id.* at 167. According to Ms.

Warling, the behavior of Garich was "very bullying" and she was "aghast" when Garich

informed Plaintiff that "If you don't behave and do what we're asking you to do today, we have

the ability to handcuff you on the premises and take you with us." Supp. Rowan Decl., Ex. 5 at

13. Warling confirmed that Garich told Plaintiff to retain an attorney. *Id.*

On July 5, 2017, Plaintiff's employment with Kairos was terminated. Warling testified

that "It wasn't until July when somebody found her mugshot online that people at Kairos

realized something was wrong." *Id.* at 16. Warling explained that "when people saw it and

posted it internally it was not okay and the director of Kairos came to me and said she would be

terminated." *Id.* Plaintiff received a termination letter from Kairos that provides the reason for

termination as "due to off duty conduct which in Kairos's view interferes with performance or

negatively reflects on the reputation of Kairos specifically being charged with three counts of

illegal activity that directly affects Kairos or performance of your job, and not having honestly

reported this to your supervisor or HR." Termination Letter (#41-12). Lelsey and NLES claim that no one from NLES ever contacted anyone at Kairos about Plaintiff's employment, or termination therefrom, and Plaintiff conceded in her deposition that she has no evidence to the contrary. Kucera Decl., Ex. 1 at 47-48.

### c. *Facts related to workplace misconduct by Lesley and NLES*

Plaintiff has alleged workplace misconduct by Lesley and NLES that contributed to her decision to leave NLES. Plaintiff has alleged that she made multiple complaints of sexually inappropriate behavior occurring at NLES to Billy Thompson ("Thompson"), a projects manager at NLES, and directly to Lesley. Although Plaintiff has not brought an adverse employment action claim against any defendant, she alleges that this misconduct contributed to her emotional distress and that her complaints about the misconduct was motivation for Lesley to lie to Detective Garich that Plaintiff had stolen money from NLES. The facts regarding the alleged workplace misconduct are as follows.

In December 2015, Plaintiff complained that Lesley called Plaintiff and told her that she "was not allowed to text back and forth with [Thompson], that she was monitoring text messages. And that, if he made a pass at [Plaintiff] and [Plaintiff] rebuffed him, that she was (sic) be forced to terminate [Plaintiff] because he was more valuable to the company than [Plaintiff] was." Supp. Rowan Decl., Ex. 1 at 89-94.

At the Super Bowl event in January 2016, Plaintiff and Lesley shared a construction trailer as a small office workspace. During work hours, Lesley divulged to Plaintiff that she was having a sexual relationship with someone. The conversation allegedly became so uncomfortable for Plaintiff that she was forced to leave the workspace. *Id.* at 95-97. Later that afternoon, Lesley again discussed her sexual relationship in the presence of Plaintiff. *Id.* at 98.

Plaintiff also complained that Lesley said inappropriate things about Plaintiff in the presence of vendors at the Super Bowl in 2016. Lesley allegedly asked Plaintiff if she was texting naked pictures of herself to Thompson. *Id.* at 99. Plaintiff also complained to Thompson about multiple incidents of impropriety by other male employees occurring during work hours while on location at the 2016 Super Bowl event. *Id.* at 71.

Finally, on December 23, 2016, Lesley entered Plaintiff's office at NLES to admonish Plaintiff for making typos in her work product and told her that she was "fucking stupid" and "needed to take [her] smart pills over the Christmas weekend and then proceeded to yell at [Plaintiff] for a good 20 minutes." *Id.* at 50. Lesley accused Plaintiff of deleting a Super Bowl file and certain shared company forms. This final incident prompted Plaintiff to seek other employment, as the hostility in the workplace had, in Plaintiff's mind, reached a boiling point. *Id.* at 49, 53-54.

At some point in 2017, Plaintiff had a conversation with Lesley's ex-fiancé, Dan Marshall ("Marshall"). According to Plaintiff, Marshall revealed that Lesley had provided him with copies of Plaintiff's bank records. Supp. Rowan Decl., Ex. 1 at 83, 126-27. Plaintiff testified that Marshall told her that Lesley "was telling everybody what my [bank] balances were and showing everybody in the office my account information and that the story was that I had sued a previous employer to get my bank balances." *Id.* at 129. After Plaintiff left NLES, her bank account was hacked, and she had to dispute unauthorized charges; Plaintiff believes that this could have only happened from information obtained and disseminated by Lesley and NLES. *Id.* at 131. Marshall testified in his deposition that he was never shown screenshots of any information obtained from Plaintiff's work computer and had only discussed Plaintiff's bank information with Lesley. Supp. Rowan Decl., Ex. 6 at 96.

According to Plaintiff, Marshall also told her that Lesley was intentionally tormenting her while she was employed at NLES, and that Lesley's goal everyday was to make Plaintiff cry. Supp. Rowan Decl., Ex. 1 at 230-31. Marshall testified in his deposition that, "I don't know that I would say that I can recall her bragging about tormenting [Plaintiff]. I do remember her making an indication that she was going to try to get her to quit by just, you know, their interaction. I had never done that with an employee so that stuck out to me as an odd way to get rid of an employee." Supp. Rowan Decl., Ex. 6 at 90-91.

## STANDARD OF REVIEW

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations unsupported by factual material are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

Defendants move for summary judgment on all claims and Plaintiff moves for partial summary judgment on the first claim only. The Court will address each claim in the order in which they arise in the Third Amended Complaint.

## I.    Claim One—Violation of Civil Rights Under Section 1983

Plaintiff has alleged under 42 U.S.C. § 1983 that Garich violated Plaintiff's Fourteenth Amendment substantive due process rights by failing to disclose the Warekois Email and Garich's friendship with Lesley to the Jackson County District Attorney, resulting in Plaintiff's prosecution. Plaintiff argues that this conduct by Garich equates to a *Brady* violation. Plaintiff also brings a Section 1983 claim against the City under the theory that the Medford Police Department ("MPD") promulgated policies that allowed Garich to violate Plaintiff's substantive due process rights by withholding evidence that was exculpatory in Plaintiff's underlying criminal prosecution and a policy of allowing Garich to investigate Plaintiff despite a conflict of interest arising out of Garich's friendship with Lesley. For the following reasons, this Court finds that Plaintiff has failed to show that Garich or the City of Medford violated her substantive due process rights.

Plaintiff would like this Court to start with the standard set out by *Brady v. Maryland*, 373 U.S. 83 (1963), but her claim under Section 1983 is first and foremost a substantive due process claim. "To state a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived [her] of a constitutionally, protected life, liberty, or property interest." *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). To state a claim for deprivation of substantive due process enforceable under Section 1983, a plaintiff must show

"(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 94 7 F.2d 1418, 1420 (9th Cir. 1991) (citation omitted).

The United States Supreme Court held that the prosecution team is required to disclose all exculpatory evidence to the defense in criminal prosecutions. *Brady v. Maryland*, 373 U.S. at 87. Evidence is considered exculpatory "where the evidence is material either to guilty or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* In *Brady*, the Supreme Court held that a prosecutor who withholds information "which, if made available, would tend to exculpate [the defendant] or reduce the penalty . . . does not comport with standards of justice." *Id.* at 87-88. Both prosecutors and law enforcement are required to disclose "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Giglio v. United States*, 405 U.S. at 154. Police investigators also violate *Brady* when they withhold information favorable to the defense, whether or not a prosecutor is even aware that the information is being withheld. *See Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Tennison v. San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009). A police officer's *Brady* obligations differ from a prosecutor's only insofar as an investigator's obligations are satisfied when he or she produces the potentially exculpatory information to the prosecutor, whereas a prosecutor must disclose such information directly to the defense. *See Cannon v. Polk Cty./Polk Cty. Sheriff*, 68 F. Supp 3d 1267, 1279 (D. Or. 2014), *aff'd sub nom. Cannon v. Polk Cty.*, 702 F. App'x 527 (9th Cir. 2017).

The holding in *Brady v. Maryland* requires disclosure of evidence that is both favorable to the accused and "material either to guilt or to punishment." 373 U.S. at 87; *See also Moore v.*

*Illinois*, 408 U.S. 786, 794-95 (1972). "A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976). The evidence suppressed in *Brady* would have been admissible only on the issue of punishment and not on the issue of guilt, and therefore could have affected only Brady's sentence and not his conviction. Accordingly, the Court affirmed the lower court's restriction of Brady's new trial to the issue of punishment. *See Bagley*, 473 U.S. at 675.

The *Brady* rule is based on the requirement of due process. Its purpose is to ensure that a miscarriage of justice does not occur. Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial: 'For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose. . . . But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* at 675-76 quoting *United Stated v. Agrus*, 427 U.S. at 108. To establish that a Brady violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching" (2) the State suppressed the evidence, "either willfully or inadvertently" and (3) "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Garich and the City assert that a *Brady* violation cannot be brought as a Section 1983 claim without a conviction. Indeed, both this Court and counsel could find only one case where a

*Brady* violation was brought as a Section 1983 claim without a conviction. However, that case involved a 24-month pretrial detention. *See Tatum v. Moody*, 768 F3d. 806 (9th Cir. 2014), *cert. den. sub nom., Moody v. Tatum*, 135 S. Ct. 2312 (2015). The reason for this lack of caselaw is because without a conviction or pre-trial detention there is no deprivation of the constitutionally protected interest in liberty. In this case, Plaintiff was not deprived of her liberty as she served no time in jail. Moreover, the criminal case against her never went to trial so she cannot argue that she was deprived of a fair trial.

Instead, Plaintiff argues that she was deprived of her constitutionally protected property interest in her job at Kairos due to Garich's conduct of withholding exculpatory or impeachment evidence. Plaintiff alleges that Garich withheld *Brady* material in the form of the Warekois Email and her relationship with Lesley, and because of this withheld evidence and information, the district attorney proceeded to file charges against Plaintiff. Plaintiff alleges that as a direct and natural consequence of such charges being filed, Plaintiff lost her new employment at Kairos and experienced substantial emotional trauma. In sum, Plaintiff's theory is that the Jackson County District Attorney's Office would not have filed charges against her, and she would not of lost her job, if Garich had disclosed her friendship with Lesley and provided the Warekois Email to the prosecutor. The evidence does not support this theory.

Both the prosecuting attorney and the grand jury attorney testified that the friendship between Garich and Lesley was immaterial to their decision to charge Plaintiff for theft. The lead prosecutor in the case against Plaintiff, Melissa LeRitz, testified in a written deposition that the case was dismissed due to Lesley no longer wishing to proceed with the criminal charges. Mitton Decl., Ex. 6 at 5 (#41-6). LeRitz testified that she would not have proceeded differently had she known about Garich and Lesley's friendship because there was sufficient evidence to take the

case to trial if Lesley had been willing to testify. *Id.* at 6. The deputy district attorney that presented the criminal case to the grandy jury, Ms. Zori Cook, also submitted a written deposition which stated, "My job as the Grand Jury Deputy on that day was to present the witnesses, evaluate the evidence as it pertained to the charged crimes, and answer questions from the jurors. Any potential friendship between witnesses was irrelevant to the presentation of facts. . . ." Mitton Decl., Ex. 7 at 3 (#41-7). Therefore, Plaintiff's theory that she would not have been charged with theft had the friendship been disclosed fails.

Although the Warekois Email would likely be considered impeachment evidence and therefore required to be submitted to the defense prior to trial, there is no evidence to suggest that this email would have prevented the DA's office from filing charges against Plaintiff. DDA Cook explained in her written deposition that her job was to present witnesses and evaluate the evidence as it pertained to the charged crimes. Plaintiff was charged with theft for adding unauthorized amounts to her paycheck. At most, the Warekois email could be used to show that Plaintiff did not commit corporate embezzlement or a higher crime for which she was not charged, but it certainly does not speak to Plaintiff's innocence or guilt in the theft of over $5,000, the crime that Plaintiff was actually charged with. Had Plaintiff's criminal case gone to trial without the Warekois Email ever being disclosed, then maybe Plaintiff would have a better argument, but that is not what happened here. There was substantial documentation to support the DA's and the grand jury's decision to charge Plaintiff with theft.

Moreover, the purpose of the *Brady* doctrine is to ensure that a defendant gets a fair trial. The caselaw surrounding the *Brady* doctrine says nothing about how prosecutors should conduct a grand jury presentation or decide whether to bring charges. *Brady* does not require that all evidence be turned over before a grand jury indictment occurs or before charges are brought.

The caselaw does not support finding a deprivation of property interest due to a failure to deliver the entire case file to a grand jury, especially when the Warekois Email does not speak to the crime that Plaintiff was actually charged with.

Finally, Plaintiff's argument that MPD had a policy of withholding certain evidence and a policy of allowing Garich to investigate Plaintiff despite a conflict of interest arising out of Garich's friendship with the victim also fails. The Medford Police Department has its own *Brady* policy that requires Medford Police to "provide the prosecution with both incriminating and exculpatory evidence, as well as information that may adversely affect the credibility of a witness," and requires officers "identify and disclose to the prosecution potentially exculpatory information." MPD Policy 611. This policy comports with the expansive disclosure requirements set out in *Brady*. Additionally, the Court has reviewed the text message exchanges between Garich and Lesley. Garich asked reasonable questions as to how Lesley wanted to proceed with filing charges and sought evidence to support Lesley's claims that Plaintiff was stealing. Based on the evidence presented and viewing the facts in the light most favorable to Plaintiff, the Court does not find a conflict of interest arising out of Garich's friendship with Lesley that would prevent Garich from investigating the case.

## II.    Claim Two—Invasion of privacy

Plaintiff's claim for invasion of privacy, also referred to as breach of confidence by Oregon courts, was brought against NLES and Lesley for sharing information relating to Plaintiff's bank accounts with others after discovering the information on Plaintiff's work computer. In order to prove a claim for invasion of privacy, Plaintiff must show "(1) the facts disclosed are private facts; (2) defendants disclosed them to the public generally or to a large number of persons; and (3) the disclosure was in a "form of publicity of a highly objectionable kind." *Simpson v. Burrows*, 90 F. Supp. 2d 1108, 1125 (D. Or. 2000).

Generally, Oregon decisions on invasion of privacy claims have not allowed recovery unless the infliction of emotional distress was the object of the defendant's conduct of sharing the private information. *See Anderson v. Fisher Broadcasting Cos.*, 300 Or. 452, 458-59 (1986) (reviewing cases brought in Oregon for invasion of privacy). In *Anderson*, the Oregon Supreme Court found that the conduct of invasion "must be designed to cause severe mental or emotional distress, whether for its own sake or as a means to some other end, and it must qualify as extraordinary conduct that a reasonable jury could find beyond the farthest reach of socially tolerable behavior." *Anderson*, 300 Or. at 459 citing *Hall v. The May Dept. Stores*, 292 Or. 131, 137 (1981). In that case, the court denied liability because although the invasion was intentional, there was no evidence that the defendant wished to distress the plaintiff. The court concluded that "the truthful presentation of facts concerning a person, even facts that a reasonable person would wish to keep private and that are not 'newsworthy,' does not give rise to common-law tort liability for damages for mental or emotional distress, unless the manner or purpose of defendant's conduct is wrongful in some respect apart from causing the plaintiff's hurt feelings." *Id.* at 469.

Employees have no reasonable expectation of privacy when they voluntarily use their work computers to access private information. *See Thygeson v. U.S. Bancorp*, 2004 WL 2066746 (D. Or.) citing *Smyth v. The Pillsbury Company*, 914 F.Supp 97 (E.D. Penn. 1996) ("[P]laintiff voluntarily communicated . . . over the company e-mail system. We find no privacy interests in such communications. . . . Moreover, the company's interest in preventing inappropriate and unprofessional comments or even illegal activity over its e-mail system outweighs any privacy interest an employee may have."). Courts have repeatedly held there can be no reasonable expectation of privacy in data or communications provided to or sent over a third-party's system.

*See State v. Meredith*, 337 Or 299, 301 (2004) (finding an employee did not have a protected privacy interest in keeping her location and work-related activities "concealed from observation or tracking by her employer in a company-owned vehicle."); *State v. Carle*, 266 Or.App. 102, 110 (2014), rev. den., 356 Or. 767 (2015) ("[T]he sender of a text message did not retain a privacy interest in the digital copy of the text message found on the recipient's phone, even if the sender 'did not expect anyone other than [the recipient] to see the text message.'").

In this case, Plaintiff accessed her personal banking and financial records on her work computer. Plaintiff knew that NLES had access to her computer and had installed the Keylogger software on her computer. Lesley and NLES gained access to Plaintiff's financial information by reviewing Plaintiff's activities on her work computer. In addition to Lesley, Plaintiff has identified three people who learned of her wealth: Ms. Lori Cook (her co-worker that originally discovered the information), Detective Garich, and Dan Marshall (Lesley's ex-fiancé). Plaintiff concedes that she has no expectation of privacy in the files on her work computer, including her own personal information. Plf.'s Response at 50 (#62). Plaintiff argues that the invasion was the "dissemination of information related to her personal financial well being (sic) to co-employees and Lesley's ex-fiancé." *Id.* at 51. Plaintiff further argues that a jury should decide whether Lesley's act of sharing information about Plaintiff's wealth exceeds the bounds of socially tolerable conduct.

Plaintiff's claim for invasion of privacy fails for three reasons. First, as Plaintiff concedes, she had no privacy interest in the information that she accessed on her work computer. An employer accessing its own computer is neither unauthorized, nor is such conduct outside the bounds of socially tolerable behavior. Plaintiff voluntarily used her work computer for personal activities. Even if Lesley had motives of wanting to keep an eye on Plaintiff, or did not trust Plaintiff, or even did not like Plaintiff, an employer wanting to keep tabs on what an employee is

doing on company time and on company equipment is not "an extraordinary transgression of the bounds of socially tolerable conduct."

Second, disclosing Plaintiff's wealth to three other people does not meet the standard of disclosure "to the public generally or to a large number of persons," as the second element requires. Lori Cook testified that she requested the Keylogger software be installed on Plaintiff's computer, not Lesley, and that she was the one who first discovered that Plaintiff was conducting personal tasks and adding money to paychecks, not Lesley. Lesley disclosed the information to Detective Garich in support of her suspicion that Plaintiff was unlawfully stealing money from NLES. These are not disclosures to the public or a large group of people. Plaintiff may have had an expectation that Lesley would not share information about Plaintiff's wealth to her then-fiancé, but even still, this does not rise to the level of public disclosure. Venting to your partner when you come home from work that you think an employee is stealing from you simply does not rise to the level of tort liability for invasion of privacy. There is no evidence that any information about Plaintiff's wealth was broadly published to a wide audience.

Finally, and most importantly, no evidence has been presented that shows that Lesley disclosed the information for the purpose of causing Plaintiff emotional distress. Plaintiff has failed to identify how three people learning that she has a large sum of money in her bank account qualifies as "highly offensive," "highly objectionable," or "an extraordinary transgression of the bounds of socially tolerable conduct." This Court is not here to decide whether Plaintiff committed theft against her employer, but no evidence has been presented that shows Lesley disclosed Plaintiff's finances for any reason other than because Lesley believed Plaintiff committed theft against NLES. Even though Plaintiff argues that she did not commit theft, no evidence has been presented to this Court that shows Plaintiff received approval to

reimburse herself for mileage, personal cell phone use, or sick pay. No evidence has been presented that explains why Plaintiff's claimed mileage for her trips to the post office were so much higher than what a round trip should have taken. There is no evidence in the record from which a reasonable juror could conclude that Lesley was lying to Garich about the alleged theft or that Lesley did not actually believe that Plaintiff had committed theft. Therefore, there is no evidence in the record from which a reasonable juror could conclude that Lesley's conduct was beyond the farthest reach of socially tolerable behavior.

### III.    Claim Three—Negligent Release of Confidential Information

Plaintiff brings a claim for negligent release of confidential information against NLES and Lesley for the same conduct alleged under her invasion of privacy claim. Plaintiff's Third Amended Complaint states that "presuming NLES and Lesley had a legal right, as [Plaintiff's] employer and supervisor, to install Keylogger software on Plaintiff's computer to track Plaintiff's activities, in so doing they assumed a duty to protect Plaintiff's confidential information." Complaint at 16 (#32). Plaintiff claims that NLES and Lesley breached that duty by disseminating Plaintiff's financial information to NLES's other employees and Lesley's ex-fiancé, and that this breach "proximately contributed to the hostile work environment that ultimately forced Plaintiff to resign." *Id.* Plaintiff argues that Lesley and NLES should have expected that if they shared information about Plaintiff's finances that Plaintiff would be embarrassed and susceptible to hacking.

To succeed on her claim for common law negligence, Plaintiff must show "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was

within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010). "When a claim for common-law negligence is premised on general principles of foreseeability, the plaintiff must plead and prove that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff." *Towe v. Sacagawea, Inc.*, 357 Or 74, 86 (2015). Foreseeability involves a prospective factual judgment about a course of events. *Fazzolari*, 303 Or at 4. "Foreseeability (what prospectively might happen) is considered separately from causation (what retrospectively did happen) and serves as a limit on the scope of liability. *Chapman v. Mayfield*, 358 Or 196, 206 (2015). That is, a defendant is liable "only when the injury caused is one which could have been anticipated because there was a reasonable likelihood that it could happen." *Id.* citing *Stewart v. Jefferson Plywood Co.*, 255 Or 603 (1970).

Plaintiff's claim is premised on the theory that NLES and Lesley assumed a duty to protect Plaintiff's financial information when they installed the Keylogger software on her computer. However, Plaintiff has provided no supporting caselaw that such a duty exists. An employee has no privacy interest in the information that they voluntarily access on their work computer. Without supporting caselaw, the Court cannot find that NLES or Lesley assumed a duty to keep Plaintiff's information accessed on her work computer private. However, even assuming that such a duty exists, Plaintiff's claim fails because the type of harm alleged was not foreseeable when the Keylogger software was installed and because the type of harm alleged is not the within the type of potential incidents and injuries that this claim was intended to prevent. Additionally, the Court does not find Lesley's conduct unreasonable.

The shared information at issue is that Plaintiff had a lot of money in her bank account. This is not highly sensitive or humiliating information. The record does not contain evidence that NLES or Lesley shared Plaintiff's account number, routing number, or bank login information. The record contains no evidence that NLES foresaw when it installed the Keylogger software that they would discover Plaintiff's personal financial information. Moreover, NLES and Lesley shared that Plaintiff was wealthy in the course of investigating Plaintiff for theft. Lesley sharing Plaintiff's financial status with Detective Garich and the employees that were aiding in the investigation does not qualify as unreasonable conduct. Lesley sharing how wealthy Plaintiff was to her ex-fiancé was inappropriate, but not unreasonable conduct considering that Lesley was venting to her then-spouse about an employee that she suspected of committing theft.

Regarding Plaintiff's damages, the record does not support finding that Plaintiff was hacked because of Lesley's conduct. This theory appears to be purely speculative. Moreover, the overarching evidence in the record shows that Plaintiff was planning to quit her job long before her wealth was shared in the office. All that remains is Plaintiff's embarrassment, and embarrassment is not the type of injury that this cause of action was intended to prevent.

## IV.     Claim Four—Intentional Infliction of Emotional Distress

Plaintiff brings a claim for intentional infliction of emotional distress ("IIED") against NLES, Lesley, and Detective Garich. Plaintiff claims that Lesley intended to inflict her with emotional distress by subjecting her to a hostile work environment and the subsequent wrongful criminal investigation "directed by Lesley and Garich." Complaint at 17 (#32). Plaintiff further claims that Garich intentionally furthered and aided Lesley's infliction of distress by acting outside the scope of her public employment duties.

To succeed on a claim for IIED, a plaintiff must show that (1) defendants intended to inflict severe emotional distress, (2) the defendants' acts were the cause of severe emotional distress, and (2) the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." *Giulio v. BV CenterCal, LLC*, 815 F Supp 2d 1162, 1180 (D. Or. 2011) citing *Madani v. Kendall Ford, Inc.*, 312 Or 198, 203 (1991). To establish the necessary element of intent, a plaintiff must prove defendant desired to inflict severe emotional distress, and knew such distress was certain, or substantially certain, to result from the conduct at issue. *Id.* quoting Restatement (Second) of Torts, § 46, comment i (1965). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* citing *Christofferson v. Church of Scientology of Portland*, 57 Or App 203, 211 (1982). The determination of whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is a question of law for the court. *Giulio* 815 F Supp 2d at 1180, citing *Delaney v. Clifton*, 180 Or App 119, 129 (2002).

Here, Plaintiff argues that there is a genuine dispute as to whether Garich's behavior, viewed together with that of NLES's and Lesley's, constitutes an extraordinary transgression of the bounds of socially tolerable conduct. Plaintiff concedes that no tort claim notice was sent, but argues that a genuine dispute exists as to whether Garich was acting as a Detective for the Medford Police Department when she investigated Plaintiff for financial crimes or whether she exceeded the scope of her duty in a manner that obviated the need to file a tort claim notice. Plaintiff has claimed that Garich was acting under the color of law in order to bring the Section 1983 claim against her and the City, and now is arguing that Garich was acting outside her job duties as an agent for Lesley. Plaintiff cannot have it both ways. The Court finds that Garich was

acting within her job duties at all times relevant to this case. While the facts are in dispute about what exactly Garich said to Plaintiff, the Court will view the facts in the light most favorable to Plaintiff. Plaintiff has alleged that Garich slammed papers down, stated that Plaintiff could be arrested, told her that she could not leave the City, and referred to Plaintiff as a "theif" to one of Plaintiff's coworkers. Such conduct does not rise to the high standard of "extraordinary transgression of the bounds of socially tolerable conduct." Moreover, because the Court finds that Garich was acting within her job duties for the City, absence of a tort claim notice is alone sufficient to find in favor of Detective Garich on this claim.

Regarding NLES and Lesley, the Court does not find Lesley's conduct involving the investigation of Plaintiff's theft to include extraordinary transgressions of the bounds of socially tolerable conduct. Lesley had the right to review Plaintiff's activity while working at NLES and had the right to pursue theft charges against her. As for Lesley's alleged conduct in the workplace including talking about her own sexual relationships in the presence of Plaintiff and gossiping about Plaintiff's potential sexual relationships, this conduct if true would not be a model of workplace professionalism and decorum. However, such conduct does not rise to the level of "extraordinary transgression of the bounds of socially tolerable conduct." Moreover, per Plaintiff's own testimony, after Plaintiff complained to her colleague Mr. Thompson about other NLES employees asking her for dinner or drinks, Mr. Thompson talked to the gentlemen and their behavior stopped.

Plaintiff believed that Lesley was "tormenting" her at work, and it seems that this belief is mostly due to the conversation Plaintiff had with Lesley's ex-fiancé, Dan Marshall. Mr. Marshall testified in his deposition that he did not recall Lesly bragging about "tormenting" Plaintiff. However, even if all Plaintiff's allegations are true, including that Lesley wanted

Plaintiff to quit her job, had called Plaintiff "stupid" or was generally unkind to Plaintiff, Plaintiff has failed to produce evidence of extraordinary transgressions beyond the bounds of socially tolerable conduct that would allow her intentional infliction of emotional distress claim to go to a jury.

## V. Claim Five—Intentional Interference with a Business Relationship

Plaintiff claims intentional interference with a business relationship against all defendants due to them allegedly causing her to lose her job at Kairos. Plaintiff claims that "Garich, at the direction of NLES and Lesley, in bad faith interfered with Plaintiff's new employment with Kairos during the May 24th Contact" when she cited Plaintiff for theft. Complaint at 18 (#32). Plaintiff pleads that "[i]n communicating with Plaintiff's new supervisor at Kairos, Garich grossly exceeded the scope of her duties as a detective employed with MPD" and that Garich was acting as an agent for NLES and Lesley for the improper purposes of exacting personal revenge upon Plaintiff for her complaints of sexual harassment, furthering Lesley's continued torment of Plaintiff, and punishing Plaintiff for Plaintiff's assertion of her constitutionally protected right to not be questioned outside of the presence of her attorney. In the alternative, Plaintiff claims that Garich's failure to turn over all discovery, including the Warekois email, as well as Lesley's wrongful initiation of a criminal investigation against Plaintiff led to false charges being filed against her, which caused her to be terminated from Kairos. *Id.* at 19.

To establish a claim for intentional interference with a business relationship, a plaintiff must prove "(1) the existence of a professional or business relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).

First, the Court finds neither Lesley nor NLES intentionally interfered with Plaintiff's employment at Kairos. There is no evidence in the record that suggests that Lesley lied about the alleged theft committed by Plaintiff. Lesley and NLES maintain that Plaintiff was reimbursing herself for mileage and other expenses for which she was not entitled. There is no evidence to suggest that Lesley did not believe that Plaintiff had committed the alleged theft and that she turned over evidence to Detective Garich for any reason other than she thought Plaintiff had stolen money from NLES. The comments that Lesley said to NLES employees and her ex-fiancé about Plaintiff being wealthy, the text messages that Lesley sent to Garich about the alleged theft, as well as the email exchange between Lesley and Plaintiff when Lesley confronted Plaintiff about the alleged theft all confirm that Lesley believed Plaintiff had stolen money from NLES. Therefore, it does not follow that Lesley falsely reported the theft or used Garich as an agent to intentionally interfere with Plaintiff's subsequent employment. There is no evidence that Lesley asked Garich to investigate the theft with the intention that it could interfere with Plaintiff's subsequent employment. There is no evidence in the record that suggests that Lesley told Garich to go to Plaintiff's place of employment to cite her for theft. Moreover, there is no evidence in the record that Lesley or anyone at NLES ever contacted anyone at Kairos about Plaintiff.

Second, the Court finds that Garich did not act with improper means or improper purpose when she went to Kairos to cite Plaintiff for theft, and that she was acting in her capacity as a Medford Police Detective and not as an agent for Lesley. Detective Garich went with another officer, was in uniform, and had authority from her office to proceed with the investigation against Plaintiff. Moreover, regardless of whether the Warekois Email or Garich's relationship with Lesley qualifies as exculpatory or impeachment evidence, *Brady* does not require that all

evidence must be turned over before a grand jury indictment occurs or before charges are

brought. Even if Garich was required to turn over this evidence before trial, there is no evidence

in the record that suggests that this evidence would have prevented Plaintiff from being charged

with theft. Neither the Warekois Email nor Garich's friendship with Lelsey negate the possibility

that Plaintiff committed theft against NLES by reimbursing herself for unapproved and inflated

travel expenses. Therefore, Garich's conduct of going to Kairos to cite Plaintiff for theft was not

done with an improper purpose or by improper means, and Plaintiff's failure to provide a tort

claim notice defeats this claim against Detective Garich and the City of Medford defendants.

## VI.     Claims Six, Seven, and Eight—Abuse of Process, Malicious Prosecution, & Fraud

Plaintiff brings claims of abuse of process and malicious prosecution against NLES,

Lesley, and Detective Garich for wrongfully reporting and wrongfully initiating criminal

proceedings against Plaintiff with the improper ulterior purpose of intentionally harassing

Plaintiff. Complaint at 19-20 (#32). Plaintiff claims fraud against NLES and Lesley for

knowingly making false statements about Plaintiff's conduct to Detective Garich with the

intention that Detective Garich would act on such false statements. *Id.* at 21.

Abuse of process is "the perversion of legal procedure to accomplish an ulterior

purpose." *Larsen v. Credit Bureau, Inc. of Georgia*, 279 Or 405, 408 (1977) citing *Kelly v.

McBarron*, 258 Or 149, 154 (1971). The essential elements of the tort are (1) an ulterior purpose

unrelated to the process, and (2) a willful act in the use of the process that is not proper in the

regular course of the proceeding." *Pfaendler v. Bruce*, 195 Or. App. 561, 571-72 (2004). The

ulterior purpose element requires a showing that defendant's purpose was to obtain something

unrelated to the process. *Columbia County v. Sande*, 175 Or. App. 400, 408 (2001). It is not

enough to show that the defendant did not prevail on the merits, or even to show that defendant's

claim was without merit. *Id*. Plaintiff's claim for abuse of process fails so long as defendant acted for "the very purpose that the process was intended to serve." *Id*. This is true even if the defendant initiated the process based upon a mistake. *Id*.

The essential elements for common law malicious prosecution are (1) defendant initiated, caused, or had an active role in continuing criminal proceedings against the plaintiff; (2) defendant acted out of a desire to harm plaintiff rather than out of a desire to bring the plaintiff to justice; (3) defendant acted without probable cause; (4) plaintiff was not guilty of the offense charged; (5) criminal proceeding ultimately terminated in favor of the plaintiff; and (6) plaintiff sustained injury or damage because of the prosecution. *Delp v. Zapp's Drug and Variety Stores*, 395 P.2d 137, 139 (Or. 1964); *see also Kuhnhausen v. Stadelman*, 174 Or 290, 310 (1944). In cases of malicious prosecution, the question of probable cause is a question of law for the court. *Delp*, 395 P.2d at 139.

The essential elements to prove fraud are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that his statement should be acted on and in the manner reasonably contemplated; (6) the hearer's ignorance of the statement's falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; (9) and plaintiff's consequent and proximate injury. *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 22 F Supp 3d 1126, 1132 (D. Or. 2014).

In this case, NLES has produced documentation of over fifty separate reimbursements made by Plaintiff to herself while performing the company's payroll duties. Through the entirety of the investigation and the lifespan of this case, NLES has maintained the position that Plaintiff was not entitled to these reimbursements and that defendants were not aware of these reimbursements until they reviewed the Keylogger software results from Plaintiff's work

computer. The documentation produced by NLES includes several instances where Plaintiff requested unpaid time off but was still paid in full for those pay periods. There is evidence of Plaintiff paying herself for extra per diem days and for milage on days that she did not work. Plaintiff has provided no counter evidence or even an explanation for why she was entitled to these payments.

Plaintiff argues that Lesley approved payroll as a defense for why these reimbursements were authorized, but has not disputed that Lesley approved payroll in its entirety rather than individual paystubs. Plaintiff has not disputed that the NLES handbook requires that mileage and phone reimbursements be approved before payment. Plaintiff has provided no evidence of any signed or otherwise approved reimbursement forms. While the amounts may have been minor, there is still undisputed evidence that Plaintiff was paying herself these reimbursements without documentation of approval. A claim for malicious prosecution requires a showing that "plaintiff was not guilty of the offense charged." No such showing has been made.

No evidence has been presented that suggests that defendants' acts of reporting Plaintiff's conduct, investigating Plaintiff's conduct, and ultimately playing a role in theft charges being brought against Plaintiff were somehow an abuse of the justice system or an abuse of Plaintiff. Plaintiff's characterization of the prosecution as "malicious," "egregious," and a "perverted criminal procedure" does not give rise to a material question of fact. The record shows that Lesley reported her suspicion that Plaintiff had committed theft to a financial crimes detective, the proper authority to investigate such crimes, and Detective Garich responded by asking for evidence to support Lesley's suspicion.

There has been no evidence presented of a false statement made by Lesley or NLES. Lesley's ex-fiancé's comments to Plaintiff that Lesley did not like Plaintiff and wanted to

"manage her out" of NLES do not negate the evidence presented of Plaintiff's unauthorized reimbursements. Plaintiff was already on her way out the door when Lesley discovered the alleged theft. That the criminal action was ultimately dismissed is not dispositive because the dismissal was not due to lack of evidence and instead due to Lesley no longer wanting to participate as a witness in the trial. Plaintiff has no proof of any benefit NLES sought to extort by way of reporting the theft. Reporting an employee for suspected payroll theft is not unlawful, nor does it give rise to tort liability. NLES was not responsible for establishing probable cause or determining whether to prosecute theft charges against Plaintiff. For these reasons, Plaintiff's claims for malicious prosecution, abuse of process, and fraud against NLES and Lesley fail as a matter of law.

As for the claims for abuse of process and malicious prosecution against Detective Garich, there is no evidence that Detective Garich had an ulterior purpose unrelated to the process of investigating the crime reported to her, or that she acted out of a desire to harm plaintiff rather than out of a desire to bring the plaintiff to justice, or that she acted without probable cause. The record shows that Detective Garich sought evidence of the theft and turned that evidence over to the District Attorney's Office in the course and scope of her professional duties as a financial crimes detective. Garich's acts of not providing the Warekois Email and not being a model of transparency that she is friends with Lesley do not give rise to tort liability, nor do they show that Garich took any willful act during the prosecution that amounts to seizing "prosecutorial control." Therefore, these claims against Detective Garich also fail as a matter of law.

## ORDER

For the foregoing reasons, Plaintiff's Partial Motion for Summary Judgment (#44) is DENIED. Defendants Detective Garich and the City of Medfords' Motion for Summary

Judgment (#38) is GRANTED. Defendants Carolyn Lesley and NLES, Inc.s' Motion for Summary Judgment (#42) is GRANTED.

IT IS SO ORDERED and DATED this 12th day of May, 2021.

MARK D. CLARKE
United States Magistrate Judge